J-A01036-25                    2025 PA Super 117

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| Appellant | : | |
| v. | : | |
| | : | |
| | : | |
| RICHARD JONES | : | |
| | : | |
| Appellee | : | No. 904 EDA 2024 |

Appeal from the Order Entered February 26, 2024
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0001518-2023

BEFORE: DUBOW, J., KING, J., and SULLIVAN, J.

OPINION BY SULLIVAN, J.:                    **FILED JUNE 6, 2025**

The Commonwealth appeals from the order granting the motion of Richard Jones ("Jones") to quash[1] and dismiss the third-degree murder and conspiracy charges against him.[2] After careful review, we reverse.

We summarize the relevant factual and procedural history of this case as follows. At around 2:30 a.m. in June 2022, then-fourteen-year-old Jones, with his fourteen-year-old co-defendant G.M., were part of a group of minors near the Stephen Klein Wellness Center near the intersection of North 22nd Street and Cecil B. Moore Avenue in Philadelphia. Jones and G.M. encountered

_____

[1] A pre-trial motion for writ of *habeas corpus* challenging the sufficiency of the evidence presented by the Commonwealth at a preliminary hearing is generally referred to in Philadelphia County as a "motion to quash the return of transcript." **See**, **e.g.**, **Commonwealth v. Ouch**, 199 A.3d 918, 922 n.2 (Pa. Super. 2018).

[2] **See** 18 Pa.C.S.A. §§ 2502(c), 903(a).

a seventy-three-year-old man ("the victim") at whom Jones once, and G.M. twice, threw a traffic cone, which ultimately caused his death.

Video footage, which captured the incident, reveals the following:

- **1:04-1:07:** G.M. picks up the cone and starts to hand it to Jones.

- **1:09:** Both G.M. and Jones are holding the cone.

- **1:10-1:17:** Jones hits the victim with the cone from behind, knocking him to the ground, and runs out of the frame to the other side of the street.

- **1:22-1:25:** G.M. hits the victim with the cone as he is trying to stand up.

- **1:30-1:35:** G.M. hits the victim with the cone again, after he has stood up, and as he is trying to walk away.

- **1:32**: Jones walks back into the frame as G.M. is about to hit the victim with the cone a second time, this time with a bag in his hand that he was not previously carrying.

- **1:36:** Jones is looking and walking in the victim's direction smiling.

- **9:15-9:35:** The group, including those who assaulted the victim, reconvenes; Jones hands a Target bag to G.M. and then mockingly reenacts the assault on the victim.

*See* N.T., 2/26/24, Commonwealth's Ex. C-3.[3]  Immediately following the attack, some of the minors fled, while others, including G.M., remained at the scene, as uninvolved pedestrians approached the area.  One of the pedestrians used G.M.'s phone to call 911, after which G.M. took her phone back, and she

_____

[3] Citations to the video reference the runtime of the video rather than the timestamp on the screen.

and the other remaining minors left. *See id*. at 3:11-3:22, 5:27-7:38.[4] The victim was then taken to the hospital where he died from brain injuries. *See* N.T., 2/26/24, at 25-26, 41.[5]

In July 2022, Jones was arrested and charged with third-degree murder and conspiracy to commit murder. A preliminary hearing was held in February 2023. Both charges were held for court. In February 2024, Jones filed a counseled motion to quash both charges. On February 26, 2024, the trial court held a hearing on the motion.

At the hearing, the Commonwealth introduced the video surveillance footage from the incident, described above, and also the testimony of medical examiner Victoria Sorokin, M.D. ("Dr. Sorokin"), who testified that the victim died from brain injuries as a result of the assault, and concluded it was the "totality" of the injuries that caused his death rather than any one specific blow. *See id*. at 41. Following arguments, the court granted Jones's motion

---

[4] The trial court wrongly inferred that it was one of the minors in the group who called 911. *See* Trial Ct. Op., 4/11/24, at 2.

[5] The trial court implies the video suggests the victim initially threw the traffic cone at the minors, though it did not make contact with them; based on our review of the video, this fact is unsupported by the record. *Compare* Trial Ct. Op., 4/11/24, at 2 *with* N.T., 2/26/24, Commonwealth's Ex. C-3, at 1:00 – 1:05 (depicting the cone falling to the ground and into the frame of the video around some of the minors, but not showing the cone's origin).

and dismissed the charges.[6]  The Commonwealth filed a timely notice of appeal, and both the Commonwealth and the trial court complied with Pa.R.A.P. 1925.

The Commonwealth raises the following issue for our review:

> Did the lower court err in concluding that the Commonwealth did not establish a *prima facie* case of third-degree murder and conspiracy where the elderly victim died of trauma to his brain after [Jones] and another teen threw a heavy traffic cone at the back of [his] head and then joked about it?

Commonwealth's Brief at 3.

Our standard of review for an order dismissing a criminal charge, based on the sufficiency of the evidence establishing a *prima facie* case at a preliminary hearing, is as follows:

> It is settled that the evidentiary sufficiency, or lack thereof, of the Commonwealth's *prima facie* case for a charged crime is a question of law as to which an appellate court's review is plenary. The trial court is afforded no discretion in ascertaining whether, as a matter of law and in light of the facts presented to it, the Commonwealth has carried its pre-trial *prima facie* burden to make out the elements of a charged crime.  Therefore, we are not bound by the legal determinations of the trial court.

***Commonwealth v. Ouch***, 199 A.3d 918, 923 (Pa. Super. 2018) (internal citations, quotations, and brackets omitted).

_____

[6] The trial court explained that G.M. was also arrested and charged with third-degree murder and conspiracy to commit third-degree murder.  After waiving her right to a preliminary hearing, and with agreement from the Commonwealth, the court transferred her case to family court for disposition and treatment.  ***See*** Trial Ct. Op., 4/11/24, at 1 n.1.

- 4 -

With respect to preliminary hearings, this Court has explained the purpose of the hearing is:

> . . . [t]o determine whether the Commonwealth has made out a *prima facie* case for the offenses charged. A *prima facie* case consists of evidence, read in the light most favorable to the Commonwealth, that sufficiently establishes both the commission of a crime and that the accused is probably the perpetrator of that crime. . . ..
>
> The Commonwealth establishes a *prima facie* case when it produces evidences that, **if accepted as true**, would warrant the trial judge to allow the case to go to a jury. The Commonwealth need not prove the elements of the crime beyond a reasonable doubt; rather, the *prima facie* standard requires evidence of the existence of each and every element of the crime charged. Moreover, **the weight and credibility of the evidence are not factors at this stage**, and the Commonwealth need only demonstrate sufficient probable cause to believe the person charged has committed the offense. Inferences reasonably drawn from the evidence of record which would support a verdict of guilty are to be given effect, and the evidence must be read in the light most favorable to the Commonwealth's case.

*Id*. (internal citations and quotations omitted; emphasis in original).

The Commonwealth challenges the trial court's order dismissing Jones's third-degree murder and conspiracy charges based on what it asserts was an erroneous conclusion that the Commonwealth failed to put on a *prima facie* case, specifically as to Jones's *mens rea*.

This Court has explained the law relevant to *mens rea* for third-degree murder as follow:

> Pennsylvania retains the common law definition of murder, which is a killing conducted "with malice aforethought." Section 2502 of the Pennsylvania Crimes Code categorizes murder into degrees. **See generally** 18 Pa.C.S.[A.] § 2502(a)-(c). Third-degree murder is defined as "all other kinds of murder," *i.e.*, those

- 5 -

committed with malice that are not intentional (first-degree) or committed during the perpetration of a felony (second-degree). *Id.* The pertinent provision of the aggravated assault statute requires proof that the defendant "attempt[ed] to cause serious bodily injury to another, or cause[d] such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S.[A.] § 2702(a)(1). . . . ***[T]he mens rea required for a conviction of aggravated assault, like third-degree murder, is malice; only the result of the crimes differ***. ***See Commonwealth v. O'Hanlon***, 653 A.2d 616, 618 (Pa. 1995) ("Aggravated assault is, indeed, the functional equivalent of a murder in which, for some reason, death fails to occur."); [***Commonwealth v.***] ***Kling***, 731 A.2d [145,] 147 [(Pa. Super. 1999)] ("There is no distinction between the malice essential to third degree murder and that necessary for aggravated assault.").

***Commonwealth v. Packer***, 168 A.3d 161, 168 (Pa. 2017) (some internal citations and quotations omitted; emphasis added).

Regarding the "malice" requirement, this Court has explained:

. . . Malice is a legal term, implying much more. It comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.

***Id***. (internal citation omitted). For either third-degree murder or aggravated assault, malice is "present under circumstances where a defendant did not have an intent to kill, but nevertheless displayed a conscious disregard for an unjustified and extremely high risk that his actions might cause death or serious bodily harm." ***Id***. (internal citations and quotations omitted). Malice also "would be present if the defendant had an intent to do the deceased great bodily harm." ***Commonwealth v. Buzard***, 76 A.2d 394, 396 (Pa. 1950).

"Ordinarily[,] where an assault is made with bare fists only, without a deadly weapon, and death results[,] there would only be manslaughter." ***Commonwealth v. Dorazio***, 74 A.2d 125, 129 (Pa. 1950). The intent involved must be to produce a bodily injury "as may be expected to involve serious consequences, either [periling] life or leading to great bodily harm." ***Id***. Crucially, "***[w]hether the malice necessary to constitute murder may be implied from the use of fists alone must depend on the particular circumstances***." ***Id***. at 130 (emphasis added). Relevant factors include "[t]he size of the assailant, the manner in which the fists are used, the ferocity of the attack and its duration[,] and the provocation are all relevant to the question of malice." ***Id***. Additionally, "it is not necessary that the injury be intended to be permanent or dangerous to life[;] it is malicious to intend injury such as to seriously interfere with health and comfort." ***Id***. Indeed, "the Commonwealth may show, and the jury is not precluded from finding, that malice existed even though a deadly weapon was not used. Malice may be found from the attending circumstances." ***Buzard***, 76 A.2d at 396. As noted above, "the *mens rea* required for a conviction of aggravated assault, like third-degree murder, is malice; only the result of the crimes differ." ***Packer***, 168 A.3d at 168. ***Accord Commonwealth v. Frye***, 319 A.3d 602, 608 (Pa. Super. 2024).

Moreover, our Supreme Court has explained the law pertaining to conspiracies as follows:

In order to prove the existence of a criminal conspiracy, the Commonwealth must demonstrate that the defendant: (1) entered an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and, (3) an overt act was done in furtherance of the conspiracy. . . . [*See* 18 Pa.C.S.A. § 903.] . . ..

At the heart of every conspiracy lies the common understanding or agreement between the actors. Implicit in any conspiracy is proof . . . that an accused agrees to participate in the alleged criminal activity. The criminal union being prosecuted cannot be based upon an agreement to complete a broad, undefined objective at some unknown point. Rather, the agreement must rest upon the mutual specific intent to carry out a particular criminal objective. The *sine qua non* of a conspiracy is the shared criminal intent. Without this common purpose, a conspiracy cannot be maintained.

Proving the existence of such an agreement is not always easy, and is rarely proven with direct evidence. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. Indeed, a conspiracy may be proven inferentially by showing the relation, conduct, or circumstances of the parties, and the overt acts of alleged co-conspirators are competent as proof that a criminal confederation has in fact been formed.

A conspiracy cannot be established based only upon mere suspicion and conjecture. Preexisting relationships or mere association of participants, without more, will not suffice to establish a prosecutable criminal conspiracy. Mere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient to prove that a particular actor was involved in a criminal conspiracy.

*Commonwealth v. Chambers*, 188 A.3d 400, 409-10 (Pa. 2018) (internal citations, quotations, emphasis, and brackets omitted).

The Pennsylvania Supreme Court addressed in detail how a conspiracy could be ascertained in context of fights, which we quote as follows:

- 8 -

Fights involving multiple participants, particularly those in which a person interjects herself into a brawl after it has commenced, present unique challenges for determining whether a conspiracy existed. As suggested above, direct evidence of the formation of a conspiratorial agreement is rare, and often must be derived from the facts and circumstances of each case. The agreement need not be formal, nor must it even be expressly communicated. It can be established instantaneously, or it can be the product of drawn-out deliberations. By way of example, in the context of multi-person fights, two participants can form a conspiracy to assault another person by discussing at length a plan to assault that person, or, alternatively, those same individuals can form the illicit agreement by mere nodding of heads, so long as they possess the requisite intent.

A conspiracy can form after one of the actors begins committing a substantive crime, such as an assault. Yet, as is the case here, determining if and when such a conspiracy arose can be difficult. Consider a case in which two people engage in a fight and another person joins in after the fight has begun. If the intervening person decided, entirely upon her own accord, to join the fight, no conspiracy would exist, regardless of her relationship to either combatant. The conspirators must at some point agree (and intend) to commit—or solicit or aid in the planning of—an assault. One joining the fight, but acting only upon her own volition and motivation, does not make a conspiracy.

Nonetheless, even if no conspiracy existed when the third party initially intervened, subsequent events can create a criminal conspiracy. For example, imagine two men fighting each other outside of a bar. A third man, a friend of one of the combatants, sees the fight and decides, on his own, to jump into the fight to help his friend. At that point, because there has not yet been a meeting of the minds, no conspiracy exists. But, imagine next that the original fighter grabs and holds his opponent by the arms and then nods to the intervening friend, who then starts repeatedly punching the restrained man. In that scenario, a conspiracy has formed when the original fighter holds his opponent and nods to the intervening man, even though no conspiracy yet existed at the point when the third man first joined the fight.

Each case must be evaluated on its own set of facts. Despite the variable circumstances under which a conspiracy can form,

particularly in assault cases, it is axiomatic and well-established that persons do not commit the offense of conspiracy when they join into an affray spontaneously, rather than pursuant to a common plan, agreement, or understanding.

*Id*. at 411 (internal citation and quotations omitted). Importantly, ***"[o]nce the conspiracy is established beyond a reasonable doubt, a conspirator can be convicted of both the conspiracy and the substantive offense that served as the illicit objective of the conspiracy*.***"** *Id*. at 410 (internal citation omitted; emphasis added). ***Accord Commonwealth v. Fisher***, 80 A.3d 1186, 1196 (Pa. 2013) (holding that where defendants "agreed to engage in the intentional, malicious attack of the victim, without regard to the consequences of that act[, which] resulted in the victim's death, their conspiracy to commit third[-]degree murder convictions were appropriate . . ..").

The Commonwealth argues the trial court erred in dismissing both the third-degree murder charge and the conspiracy charge. In support of the third-degree murder charge, the Commonwealth argues that the circumstances of Jones's assault of the victim establish malice, including the size disparity between Jones and the victim, the fact that the victim, a seventy-three-year-old man, was defenseless, and Jones struck him from behind with the cone with enough force to cause him to fall. ***See*** Commonwealth's Brief at 5, 16. The Commonwealth additionally asserts the following in support of the conspiracy charge: G.M. handed Jones the cone he threw at the victim; then, while Jones moved out of the frame for only a few

seconds, G.M. picked up the cone and threw it at the victim, after which Jones moved back into the frame, smiling; and, after the assault, Jones handed G.M. his bag while he mimicked the victim's fall to the ground. *See id*. at 19.

The trial court considered the Commonwealth's arguments and rejected them. With regard to Jones's malice, or lack thereof, the trial court concluded that Jones threw the cone a single time and did not strike the victim thereafter, but "walked away," and, accordingly, the Commonwealth could not establish Jones knew "there was an unjustified and extremely high risk that his actions might cause serious bodily injury or the death of the victim, or that he had a conscious disregard for that risk." Trial Ct. Op., 4/11/24, at 4.

With regard to conspiracy, the trial court concluded as follows:

> To prove conspiracy, the Commonwealth must demonstrate that [Jones] entered into an agreement to commit or aid in an unlawful act with another person or persons with a shared criminal intent and that an overt act was done in furtherance of the conspiracy. . . ..
>
> Here, [Jones] demonstrated no shared criminal intent with [G.M.] The video did not establish that the two agreed in any way to act in tandem. [Jones] threw the traffic cone one time, after which he crossed the street and left the scene.[7] [G.M.] continued on her own to pick up the cone and strike the decedent twice over, knocking the man to the ground on both occasions. Like the defendant in **Chambers**, [G.M.] appears to have joined the

---

[7] This depiction is an inaccurate recitation of the actions depicted in the video. While Jones did jog across the street after he threw the cone G.M. handed him at the victim, Jones merely went across the street and outside of the video frame. He comes back into the video frame approximately 15 seconds later, carrying a bag in his hand and walking toward G.M. and the rest of the minors. Jones did not leave the "scene" entirely as is intimated in the trial court opinion.

- 11 -

altercation upon her own volition and motivation. ***There is no evidence that [Jones] or [G.M.] expressly agreed, gestured to one another, or invited each other's participation in any way to work in concert against the decedent;*** consequently, the Commonwealth did not establish [a] *prima facie* [case] that the two formed a conspiracy.

Trial Ct. Op., 4/11/24, at 5 (unnecessary capitalization omitted; emphasis added).

Following our review, we conclude that the trial court erred. We focus first on the conspiracy charge because it is well settled that if Jones is liable for conspiracy to commit third-degree murder*,* then he is liable for the substantive offense as well. ***See Chambers***, 188 A.3d at 410. The evidence, when viewed in the light most favorable to the Commonwealth as the law requires, shows that from the outset Jones and G.M. worked in tandem to confront the victim and throw the cone at him, with G.M. initially handing the cone to Jones, Jones throwing it first, and G.M. throwing it two more times thereafter. The agreement between Jones and G.M. to throw the cone at the victim is established at the moment G.M. hands the cone to Jones to throw at the victim. ***See*** N.T., 2/26/24, Commonwealth's Ex. C-3, at 1:04-1:09. The video shows Jones's and G.M.'s association even before the first blow to the victim. This initial hand off showed a shared understanding that they would throw the cone at him; Jones and G.M. both threw the cone at the victim; and then they reunited just after the assault, after which Jones is observed joking with G.M. about the attack and mimicking the victim's fall to the ground. ***See id***. at 1:10-1:38, 9:15-9:30. Thus, the trial court erred in overlooking these

indicia of a shared understanding between Jones and G.M. and concluding, to the contrary, that there was no shared understanding. *See* Trial Ct. Op., 4/11/24, at 5 (stating, "[G.M.] appears to have joined the altercation upon her own volition and motivation. There is no evidence that [Jones] or [G.M.] expressly agreed, ***gestured to one another, or invited each other's participation in any way to work in concert against the decedent*** . . .." (emphasis added).

Because the evidence supported at least a *prima facie* case of an agreement, and intent, to assault the victim with the cone, we look to the remaining elements of third-degree murder. There is no dispute that the victim died from some combination of the blows to his head caused by Jones and G.M. and the fall to the ground. ***See*** N.T., 2/26/24, at 41 (Dr. Sorokin testifying that the victim "was struck on the head multiple times[,] plus he fell on the hard pavement. So the totality of injuries caused his death"). This establishes the overt acts of the co-conspirators as well as causation.

Having established a *prima facie* case of conspiracy as well as the victim's death as a result of Jones's and G.M.'s combined actions, we lastly look to malice. As this Court has recently explained, "For either third-degree murder or aggravated assault, malice is present under circumstances where a defendant did not have an intent to kill, but nevertheless displayed a conscious disregard for an unjustified and extremely high risk that his actions might cause death or serious bodily harm." ***Frye***, 319 A.3d at 607 (internal

citation and quotations omitted). Here, malice is established by the fact that Jones threw a traffic cone from behind at an elderly victim, knocking him to the ground, and then G.M. threw a traffic cone two times at the elderly victim from behind as he was trying to rise up from the ground and walk away, having been previously hit from behind with the traffic cone. *See*, *e.g.*, *Buzard*, 76 A.2d 395-96 (several strikes to the head of a victim from behind which cause the victim to die are enough to show malice). Thus, there was a *prima facie* case that Jones and G.M. agreed to assault the victim with cone, and Jones and G.M. both performed overt acts showing the requisite malice in furtherance of this shared intent to attack the victim.

Accordingly, the Commonwealth put forth a *prima facie* case of conspiracy to commit third-degree murder, and thereby, also a *prima facie* case of Jones's liability for the substantive offense of third-degree murder. *See Chambers*, 188 A.3d at 410 (stating that once the conspiracy is established beyond a reasonable doubt, a conspirator can be convicted of both the conspiracy and the substantive offense that served as the illicit objective of the conspiracy). The trial court erred in concluding to the contrary.

Notwithstanding Jones's liability for conspiracy, and thereby the substantive offense of third-degree murder, we note that the Commonwealth also put on a *prima facie* case for the substantive offense of third-degree

murder based on an accomplice liability theory.[8]  A person is an accomplice and "equally criminally liable for the acts of another if he acts with the intent of promoting or facilitating the commission of an offense and agrees, aids, or attempts to aid such other person in either planning or committing that offense."  *Chambers*, 188 A.3d at 415 (internal citation and quotations omitted); *see also* 18 Pa.C.S.A. § 306(b)(3), (c)(1) (setting forth the requirements for accomplice liability).  The "least degree of concert or collusion in the commission of the offense is sufficient to sustain a finding of responsibility as an accomplice." *Commonwealth v. Kimbrough*, 872 A.2d 1244, 1251 (Pa. Super. 2005) (internal citation and quotation omitted) (affirming a conviction for third-degree murder under an accomplice theory of liability).  The evidence discussed *supra* establishes a *prima facie* case of Jones acting with the intent to facilitate the malicious assault of the seventy-three-year-old victim, which resulted in his death, by coordinating with G.M.

_____

[8] A defendant may be convicted of a crime under an accomplice liability theory even though charged as a principal.  *See*, *e.g.*, *Commonwealth v. Spotz*, 716 A.2d 580, 588 (Pa. 1998).  Unlike conspiracy, an inchoate crime, accomplice liability is an uncharged theory of criminal liability that the Commonwealth may use to prove guilt of a substantive criminal offense. Moreover, even at trial, the Commonwealth's failure to initially proceed on the theory of accomplice liability does not later preclude a defendant's conviction under this theory as long as the defendant knows the Commonwealth may pursue theories of liability that link the defendant and another in the commission of crimes.  *See*, *e.g.*, *id*. at 588; *Commonwealth v. Potts*, 566 A.2d 287, 293 (Pa. Super. 1989).

to throw the traffic cone at him from behind, with Jones aiding the assault by throwing the cone first at the victim.

In sum, we reverse the trial court's order granting Jones's motion to quash and dismiss the conspiracy and third-degree murder charges, and remand for further proceedings consistent with this decision.

Order reversed.  Case remanded.  Jurisdiction relinquished.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>6/6/2025</u>