## Commonwealth *v.* McBurney, Appellant, et al.

Argued April 10, 1944. Before KELLER, P. J., BALDRIGE, RHODES, HIRT, KENWORTHEY, RENO and JAMES, JJ.

*Harry A. Estep,* with him *U. G. Vogan,* for appellant.

*Earle R. Jackson,* Assistant District Attorney, with him *Russell H. Adams,* District Attorney, for appellee.

OPINION BY RENO, J., July 15, 1944:

Appellant and Charles Ralph Vore were convicted of arson. The Commonwealth's theory was that Vore set fire to appellant's property and that appellant procured Vore to do the job. Against Vore the Commonwealth introduced, inter alia, his signed confession. If it implicated appellant, the statements referring to appellant were not read to the jury, and are not before us. Appellant was not at or near the scene of the crime, and the evidence against him was wholly circumstantial. His appeal questions its sufficiency.

Appellant owned a bowling alley built upon leased ground in a rural district near Pittsburgh. It was burned during the early morning of June 17, 1943, in a fire which was undoubtedly incendiary. The bowling alley had not been operated since the early part of June because, as one of appellant's witnesses testified, there was not much business at that time. It had been insured for $5,000, but that insurance was canceled in January, 1943. On May 29, 1943, new insurance in the sum of $6,500 was obtained by appellant.

On the afternoon of June 16, 1943, Ralph Vore and Clara Wiseman left his home in Canton, Ohio, and drove in a borrowed automobile to Pittsburgh. On the outskirts of that city, Vore stopped his car and met and talked with appellant, who was waiting there in an automobile. Both cars proceeded into Pittsburgh, Vore following appellant's car. Appellant, Vore and Mrs.

Wiseman dined together in a Pittsburgh restaurant. A West Virginia lawyer, H. F. Raymer, a witness for defendant, met Vore and appellant as they were about to leave the restaurant, and testified that he heard them discussing the possibility of employing Vore at the bowling alley. Raymer and appellant left Pittsburgh in appellant's car, and Vore returned to the restaurant. Later, Vore and Mrs. Wiseman drove the borrowed automobile to a point outside of Pittsburgh where they parked and watched airplanes coming in and going out of the airport. From there they drove to the bowling alley building, and parked the car in front of the building while they had refreshments in a nearby tap room. When it closed, they returned to the car where Mrs. Wiseman fell asleep. She awoke when the car was started, and, so she testified, looking out of the car she saw that the bowling alley was on fire, that is, "a small fire by the doors." Vore and she drove to Canton, arriving there at about 7:30 A. M. on June 17th.

Vore, in his confession, stated: " . . . . . . I entered the bowling alleys by the side door, finding the prearranged gasoline and so forth to start the fire with. Q. Charles, you say gasoline and so forth. What else was there besides the gasoline? A. Paper. Q. Was that according to instructions? A. Find the paper and gasoline there which would be used to start the fire. Q. Well, tell us just how you did use it when you went in? A. Well, entering the side door of the bowling alleys, I found a can of gasoline sitting on the floor, which I poured around the floor and there seemed to be some benches and using the paper as a slow lighter, I set it afire and then left."

The Ohio license number of the automobile driven by Vore had been observed near the scene of the fire and, after an investigation by detectives, Vore was arrested in Canton on September 15, 1943, and lodged in the Allegheny County prison. On that day, appellant was,

unknown to the authorities, in Canton, and he drove Mrs. Wiseman from Canton to Pittsburgh, and there paid her bus fare to Ward, West Virginia. There, on October 16th, she was apprehended as a material witness and brought to Pittsburgh.

While Mrs. Wiseman was in West Virginia, appellant wrote three letters to her. In a letter dated October 10th, appellant requested Mrs. Wiseman, in order to help Vore, to sign and return a statement which he had prepared and enclosed. In the letter he wrote, inter alia: "We are building up a case against the detectives for bringing him over here as he had no business to come and if he hadn't they could never have done one thing against him. ...... We are going to have his Mother, Dad and Brother swear that he stayed all night at their house the night of June 16th, and you all borrowed the car from that man and you all were on that trip as you stated the next day. He arrived home about 7:30 on the morning of June 17th from his home and that you all were on that trip on the day and night of June 17th, which is correct. But from now on you never were in Pittsburgh with him nor were you talking with me on that trip at any place nor time and that you were all together at all times, so be sure that you all understand that and be sure to stick strictly to it to every person. No person but myself knows where you are so you do not need to be afraid and even if they do you do not need to say a word so they cannot do a thing. Be sure to send this paper right back today so we can get to work on it. What can you get Grace to do about signing a paper like it or just say that she was on that trip. None of you will ever need to come to Pittsburgh, I will write you later again but rush this paper back to me." Mrs. Wiseman signed the statement, and returned it to appellant. Its general tenor was that she had overheard detectives

threatening Vore and trying to have him implicate appellant.

On October 14th he wrote to her to be "very, very sure not to permit one living person to know where you are" until Vore is out of prison, that she must not permit herself "to be found until this is entirely over," that "they are hunting all over for you", and that "if any person does find out where you are and go there don't answer one question without getting an attorney there and don't sign any thing." His letter proceeds: "You were not in Pittsburgh with him. He went to see his mother—leaving C about 3 on the 16th and returned the next morning around 8 or later. Now be sure that you know every part of that, and you all borrowed that car and went for that trip on the 17th and did not get back until—I believe you said you said 8 or nine on the morning of the 18th. ...... Will send you some money at once when I return." And on October 18th he addressed the final letter to her which was received and opened by her uncle after she had been arrested. It contained a five dollar bill and the following: "So step right in now and help me. I will furnish the money but I must have you all to help otherwise. Get in touch with all these people and let me know what they will do. Do this at once—please. ...... (Burn all mail at once please)"

Neither Vore nor appellant testified. The jury had before it the foregoing facts without denial or contradiction. It had Vore's confession, and it could discern that he had no pecuniary interest in the bowling alley, and that his act in burning it might well have been inspired by some one who did have such an interest, by one whose business was not prospering and who had shortly before the fire secured new insurance upon it. It could infer that Vore came from Canton to Pittsburgh pursuant to a pre-arranged plan; otherwise why should he meet appellant at a place near Pittsburgh

where appellant was apparently awaiting Vore's arrival? It could find from the testimony of appellant's own witness that Vore and appellant discussed the bowling alley and Vore's employment. It could find that Vore and appellant were alone together and that afterwards Vore proceeded to the bowling alley building and fired it. It could find that when Vore entered the building he found "the prearranged gasoline and so forth to start the fire with", and infer that someone who had a motive for destroying the building had previously arranged the materials. But, most damning of all, it could find that appellant transported a material witness from Canton to West Virginia on the very day that Vore was arrested in Canton, and that thereafter he engaged in the nefarious business of manufacturing a case which should exonerate Vore and himself. It had before it the strange and unnatural spectacle of a man trying to exculpate one who was charged with burning his own property. From all these facts and circumstances, and the inferences which naturally, indeed inevitably, flowed from them, the jury was fully warranted in finding appellant guilty. The verdict is sustained by the rule: "When a crime charged is sought to be sustained wholly by circumstantial evidence the circumstances proved should be such as reasonably and naturally to justify an inference of the guilt of the accused, and should be of such volume and quality as to overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt": *Com. v. Marino*, 142 Pa. Superior Ct. 327, 334, 16 A. 2d 314; *Com. v. Meyers*, 154 Pa. Superior Ct. 8, 11, 34 A. 2d 916; *Com. v. Ott*, 154 Pa. Superior Ct. 647, 36 A. 2d 838.

As stated, neither Vore nor appellant testified in his own behalf. In their defense they produced witnesses to show that one Caesar Repetta, the husband of the woman from whom appellant leased the land upon

which he erected his bowling alleys, had burned the building. It is not necessary to review or even summarize that testimony. The jury did not believe it and it could hardly be expected to believe it in the face of Vore's confession and other evidence produced by the Commonwealth which we have not stated. But, since both sides contended that the fire was incendiary in origin, there was, in addition to the lay and expert testimony introduced by the Commonwealth upon that subject, unassailable support for the jury's conclusion that the building was wilfully and maliciously burned.

An incident of the trial calls for attention. When Vore's confession was introduced into evidence, the trial judge ruled that it "may be introduced solely for the purpose of showing guilt, if any, on the part of Ralph Vore". The confession was a stenographic report of an interview between detectives and Vore, consisting of questions and answers. The trial judge personally edited the confession, deleting the parts which implicated appellant, and instructed the prosecuting officer to read only the parts remaining. Nevertheless, the assistant district attorney, through inadvertence undoubtedly, read a question put to Vore by the examining detective: "Q. At that time was it stipulated the amount that was to be paid?" Instantly, the trial judge, without request from appellant's counsel, interrupted and prohibited the reading of the answer by the admonition: "No, no, not that." Appellant was represented by one of the ablest and most skillful members of the Allegheny bar, but he took no exception to the reading of the question, nor did he request the court to withdraw a juror. Apparently, at that time, he was satisfied that the trial judge had adequately protected his client's rights.

On appeal, he argues that the action of the prosecuting officer was highly prejudicial and that the trial judge should have withdrawn a juror upon her own

motion. There are undoubtedly situations which require such action, but we are not convinced that this case calls for our intervention. Considering all the circumstances of the incident and the trial as a whole, the record shows an able trial judge punctiliously protecting appellant's rights and securing a fair and impartial trial for him.

The judgment of sentence is affirmed and it is ordered that defendant appear in the court below at such time as he may be there called, for compliance with the sentence or any part thereof which had not been performed at the time the appeal was made a supersedeas.